UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JLB LLC,
      Plaintiff,

v.

CHRISTIAN R. EGGER,
      Defendant.

Civil Action No. _____

**VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT,
DAMAGES, AND EQUITABLE RELIEF**

**INTRODUCTION**

Plaintiff, JLB LLC (the "Owner"), on behalf of itself and *Lisa G*, a new 2019 Viking 68 foot yacht U.S.C.G. Official No. 1292860 (the "Vessel"), brings this action against Defendant, Christian R. Egger ("Egger") for declaratory judgment, breach of contract, and injunctive relief enjoining Egger from commencing duplicative actions in Florida or in any other jurisdiction, and from taking any action against or in pursuit of restraint of the Vessel.

This case arises from Egger's misconduct while delivering the Vessel from Florida to Massachusetts.   Egger violated the Owner's written no drinking, maintenance and communications policies and as a result subjected the Vessel to increased danger principally caused by his intoxication for significant time periods.  Egger's wrongful activities included, without limitation: prolonged periods of intoxication; conversion of the Vessel to Egger's personal use for several time periods for personal fishing and partying; failure to respond to the Owner's repeated calls over a protracted periods to review maintenance and safety requirements; repeated direction to keep the mate from communicating with the Owner; unauthorized consumption of the Owner's liquor and use of Owner's new personal belongings, including

fishing gear; and refusal to adhere to the agreed upon written safety and maintenance protocols of the Vessel.  After Egger's continuing misconduct, the Owner dismissed Egger and as a result has incurred damages exceeding $25,000.

In an attempt to keep the Owner from asserting claims of misconduct against him, Egger, via his attorney, threatened to arrest the Vessel and to assert a baseless maritime lien claim upon its return to Florida.  The amount of Egger's claim is set forth in his lawyer's demand letter, a copy of which is appended as Exhibit A.  To avoid arrest of the Vessel while the parties judicially adjudicate their rights, the Owner offered to place cash in the amount of 200% of Egger's claim in an escrow account.  Egger refused and, instead, has sought to leverage the threat of arrest of the Vessel to strong-arm an unwarranted and unjustified result.

The Owner is entitled to damages for breach of contract and to a declaratory judgment that Egger is not entitled to a maritime lien.  Under the circumstances, the Owner is also entitled to prejudgment relief enjoining Egger from pursuing a separate action and/or maritime lien claim in Florida or elsewhere and from taking any action to arrest or otherwise interfere with the Owner's possession and/or use of the Vessel.  The Owner reiterates its agreement to deposit as the Court directs, either a payment bond or a cash deposit, a sum that will assure payment of Egger's claim to avoid his pursuit of a maritime lien until the whole of the matters are adjudicated.

## PARTIES, JURISDICTION AND VENUE

1.     The Owner's principal place of business is 180 Wells Avenue, Suite 100, Newton, Massachusetts 02459.

2.     Upon information and belief, Egger is an individual with a residence at 1443 S.W. 5th Ct. Rear, Fort Lauderdale, Florida.

3.     Jurisdiction is based on the Court's admiralty jurisdiction under 28 U.S.C. §1333(1) and supplemental jurisdiction under 28 U.S.C. §1367(a).

4.     The Court's federal question jurisdiction under 28 U.S.C. §1331 also affords jurisdiction in this action under the Declaratory Judgment Act, 28 U.S.C. §2201.

5.     Venue is based on 28 U.S.C. §1391(a) since a substantial part of the events which give rise to this action occurred and continue to take place within the Commonwealth of Massachusetts.

6.     The Vessel is also currently docked in Massachusetts.

## FACTUAL BACKGROUND

7.     In February 2019, the Owner took delivery of the Vessel, a new custom designed sport fishing yacht, in New Jersey.

8.     At all pertinent times, Egger held himself out as being an experienced, mature, fully qualified and licensed yacht Captain capable of being entrusted with the care, custody, operation and oversight of a quality yacht.

9.     On May 4, 2019, the Owner, from its business location in Massachusetts, responded to an online advertisement by Egger offering his services to East Coast yacht owners.

10.     During a telephone conversation between Egger and the Owner, Egger offered to make himself available for an interview by the Owner in the Boston area.

11.      On May 12, 2019, Egger met with the Owner in the Boston to discuss with Egger the terms of the Owner's position which would commence with his taking over care and custody of the Vessel to deliver it from Florida to Massachusetts, and more generally, to oversee, operate and maintain the Vessel while in his care.  Egger's responsibilities were discussed to include the responsibility for supervision of the yacht's full time mate.

12.     During the interview, the Owner provided and reviewed with Egger a copy of the "Abbreviated Crew Requirements" (the "Crew Requirements") which specified, *inter alia*, that the Captain was "responsible for the proper operation and maintenance of all aspects of the [V]essel with the primary objectives being the absolute first class overall upkeep of the [V]essel and maintaining the highest of safety standards."  A copy of the Crew Requirements is attached as <u>Exhibit B</u>.

13.     During the interview process it was specifically reviewed that Egger, as Captain of the Vessel, would be subject to "a zero tolerance [policy] for drugs/substances which will be grounds for immediate termination… Operating the [V]essel under the influence of any substance/drug or alcohol shall be grounds for immediate termination."  *Id.*

14.     During the interview, the Owner also provided and reviewed with Egger a copy of the "Maintenance Schedule" which included a preventative systems maintenance program to be followed on a daily and month basis.  A copy of the Maintenance Schedule is attached as <u>Exhibit C</u>.

15.     The Owner explained and Egger confirmed that adherence to the written Crew Requirements and Maintenance Schedule were essential to the position and that any breach would subject the crew to immediate dismissal.

16.     During the interview, Egger represented that he was a non-smoker, had a clean record, and had many fully satisfied references.

17.     Egger was informed during the interview and thereafter that timely delivery of the Vessel to Falmouth, Massachusetts was important for the Owner's business purposes.

18.     During the interview, Egger, stated that he was looking forward to being stationed on Cape Cod because he (or his wife) had family in the area.

19.     Upon delivery of the Vessel, the vast majority of the Captain's responsibilities would be undertaken ashore; it being estimated that 20% of the crew's estimated work time would be spent offshore.

20.     During the interview, Egger reiterated that he understood the requirements and if hired assured that he would carry out all of his duties in an exemplary manner.

21.     Thereafter, the Owner offered to pay Egger $85,000 per year and, responsive to Egger's request, agreed to rent an apartment in Falmouth, Massachusetts where Egger and his family could reside during the 2019 summer months.

22.     Egger accepted the position as Captain of the Vessel on the terms above described.

23.     Egger's position as Captain of the Vessel began on June 1, 2019.  The scheduled June 5th departure date of the Vessel was important to enable timely delivery of the Vessel to Massachusetts.

24.     Contrary to the specific agreed upon terms of engagement, on June 6th, during the delivery, Egger instructed the mate during the workday that he was going to divert the delivery of the Vessel to go fishing and Egger instructed the mate not to communicate that to the Owner, and the mate complied.  Egger's fishing included his use of Owner's brand new, unused custom fishing gear and Egger directed that fish caught be stored in a cockpit stowage box which had never been used.

25.     Contrary to the specific agreed upon terms of engagement, during the delivery of the Vessel and upon arrival to port each evening after fueling, Egger failed to participate in the clean-up and daily preventative maintenance of the Vessel.

26.     Contrary to the specific agreed upon terms of engagement, the Owner was informed that Egger regularly consumed alcohol at least upon arrival to port and set up a mock vodka bar with the Owner's alcohol and facilities.

27.     Despite Egger's representation to the Owner of being a non-smoker, Egger smoked approximately one pack of cigarettes per day, including on the Vessel.

28.     Contrary to the specific agreed upon terms of engagement, Egger also failed to properly prepare the Vessel prior to departure during each day of the delivery by failing to secure the Owner's personal property and loose items and boat supplies, i.e., leaving lines, cleaning items and the grill out and loose in the cockpit, and not properly stowing or securing said items in a manner consistent with customary good and safe practices.

29.     Contrary to the specific operating parameters established by Owner, on June 7th, the Owner received an electronic alert from the Vessel's electronic tracking system that Egger had been operating the Vessel at excessive speeds for excessive periods of time.  As a result of the foregoing, after just three days of run time Egger significantly exceeded the amount of fuel consumption requiring Egger to request an increase in the Owner's provided credit card limit for fueling.  In order to appease Egger and encourage delivery of the Vessel on schedule, the Owner complied.

30.     At that time, the Owner contacted the mate directly because he had become concerned about the Vessel's safety and care.  The mate then confessed that he and Egger had used the Vessel to go fishing and expressed concerns about the overall delivery conditions.

31.     The following morning Egger contacted the Owner stating that he had decided to turn around due to the sea conditions and would be returning to port.  However, contrary to explicit instructions from Owner for the crew to standby to depart at the first break in the

weather, the Owner was advised that Egger proceeded to drink alcohol over the next several hours during which he refused to take the Owner's calls.

32.     Because of Egger's intoxication, Egger missed an opportunity to resume the trip and timely deliver the Vessel by the scheduled June 14th arrival date.  As a result, the Vessel was not delivered by the agreed-upon date and the Owner was compelled to cancel a business event on the Vessel with several important clients and has been unable to reschedule the event.

33.     After several unanswered text messages from Owner to Egger, Egger's condition so deteriorated that the mate called the Owner.

34.     During the telephone call, the mate, who sounded intoxicated, advised the Owner that he had to be "110% honest" and that Egger "was not the right Captain."  The mate explained that Egger was running the Vessel "too hard" and that Egger had directed him not to have any communication with the Owner and not to work hard because they were being underpaid.

35.     Several hours later the Owner received a telephone call from Egger whose slurred speech and incoherent comments confirmed that he was severely intoxicated.  During that call, the Owner reiterated the no drinking policy and made clear that drinking at any time while Egger was charged with the care and custody of the Vessel was strictly prohibited.  Egger responded by stating: "I will do what I want on my day off!"  Egger was not on a day off.

36.     At that time, the Owner was left with no alternative than to dismiss Egger and prohibit him from being on the Vessel.

37.     Out of concern for the safety of the parties involved and to protect the Vessel, the Owner then contacted the Hampton, Virginia Police Department and the local dock master for assistance in having Egger removed from the Vessel.

38.     Throughout the rest of June 9th, Egger continued to contact the mate and attempted to encourage the mate to depart as well.

39.     The situation had become so contentious that the dock master assured the Owner that he would stay on-site in the dock office to protect the Vessel if needed from Egger.

40.     On June 10th, Egger contacted the Owner and apologized for his "irresponsible conduct".

41.     In response, the Owner suggested that, in an effort to resolve the situation, Egger write a letter of apology and agree to reimburse the Owner for the prepaid rental housing costs, costs for fuel for fishing, and other costs incurred.

42.     Although Egger promised to send an email to confirm his apology by noon of the next day, no such email was ever received; instead, Egger continued to contact the mate claiming to have hired a maritime attorney and encouraging the mate to talk to him to agree on a strategy for a lawsuit.

43.     At approximately noon on June 10th, being very concerned about the safety and condition of the Vessel, the Owner flew to Hampton, Virginia and the Owner witnessed that the Vessel was in a state of disarray.

44.     As a result of Egger's conduct, the Owner incurred substantial costs including, but not limited to, travel and lodging costs to secure and protect the Vessel in Virginia, rent for the apartment the Owner had rented for Egger's use in Falmouth, a substitute Captain hired by the Owner on short notice, and unauthorized fuel charges and maintenance incurred by Egger during his unauthorized personal use of the Vessel, the total of which charges exceed $25,000.

45.     On June 12th, Egger, through Florida counsel, sent a letter to the Owner demanding payment in the amount of $2,672.96, which purportedly included wages and

repatriation charges, and threatened to pursue and foreclose upon a maritime lien in the event of nonpayment.  A copy of the June 12th letter is attached as Exhibit A.

46.      On June 14th, the Owner, through Massachusetts counsel, rejected Egger's demand and contended that Owner is instead entitled to damages due to Egger's misconduct and numerous breaches of contract.  A copy of the June 14th letter is attached as Exhibit D.

47.      Thereafter, the Owner hired Florida counsel who, on behalf of Owner, offered to post 200% of the amount of Egger's claim in cash in an escrow account to be held as a security for Egger's claim.   However, Egger refused to accept the escrow proposal.

48.      Upon information and belief, in an effort to extort an unwarranted settlement from the Owner Egger continues to threaten seizure of the Vessel upon its return to Florida.

49.      To avoid arrest of the Vessel and provide adequate security for Egger's purported claims, the Owner is willing to deposit into Court by bond or cash the amount of 200% of Egger's claims.

## COUNT I
## DECLARATORY JUDGMENT

50.      The Owner realleges and reasserts the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

51.      It is apparent from Egger's actions in this matter and in other similar circumstances that Egger's threats to detain and arrest the Vessel, notwithstanding adequate security having been offered, amounts to an unwarranted attempt to extort a fully unwarranted result.

52.      The Owner is entitled to a declaratory judgment, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §2201, declaring and adjudging that: (a) The Owner is entitled to all damages,

costs and fees it has sustained and will sustain as a result of Egger's breach of his obligations; and (b) Egger is not entitled to a maritime lien against the Vessel.

## COUNT II
## BREACH OF CONTRACT

53.     The Owner realleges and reasserts the allegations contained in paragraphs 1 through 52 as if fully set forth herein.

54.     Egger failed and refused to fulfill his obligations under the terms of his engagement as Captain of the Vessel.

55.     As a result of Egger's breaches as aforesaid, the Owner has been damaged and continues to be damaged thereby.

56.     Egger is liable to the Owner for all damages and costs sustained as a result of his numerous and substantial breaches.

## COUNT III
## INJUNCTIVE RELIEF

57.     The Owner restates and realleges Paragraphs 1 through 56 above as if fully set forth herein.

58.     The Owner has a substantial likelihood of success on the merits of its claims given the clear, apparent and egregious breaches by Egger of the Crew Requirements and the Maintenance Requirements and generally accepted conduct reasonably required of a Captain in charge.

59.     By reason of Egger's threats to arrest the Vessel, the Owner will be immediately and irreparably harmed if Egger is not enjoined and restrained from pursuing a claim for maritime lien and arrest of the Vessel or taking any other action to interfere with the Owner's use

and enjoyment of the Vessel when Owner has committed to place funds in escrow to assure payment if determined as being owed after judicial determination of the rights of the parties.

60.     Moreover, parallel federal suits in different jurisdictions are disfavored and, therefore, the Court in a first-filed action has the power to enjoin and should enjoin the parties from proceeding in a second action absent a showing of special circumstances that would give priority to the second action.  There are no special circumstances present in this case which would give priority to any subsequently filed action by Egger.

61.     Further, pursuant to Supplemental Admiralty and Maritime Claims Rule E(5)(b), the owner of any vessel may file a general bond or stipulation, with sufficient surety, to be approved by the court, conditioned to answer the judgment of such court in all or any actions that may be brought thereafter in such court in which the vessel is attached or arrested.

62.     Upon approval of said stipulation, the execution of all such process against such vessel shall be stayed so long as the amount secured by such bond or stipulation is at least double the aggregate amount claimed by plaintiffs in all actions begun and pending in which such vessel has been attached or arrested.

63.     The Owner is entitled to approval of a stipulation in accordance with Supplemental Admiralty and Maritime Claims Rule E(5)(b) and to an order of the Court enjoining Egger from: (i) commencing any action or pursuing any claim for maritime lien, except in the above-captioned action, against the Owner or the Vessel; and (ii) commencing any action to arrest the Vessel and from otherwise interfering with the Owner's use and enjoyment of the Vessel.

**WHEREFORE**, the Owner demands:

1.      That, as to Count I, this Court issue a declaratory judgment in the Owner's favor pursuant to Fed. R. Civ. P. 67 and 28 U.S.C. §2201 declaring and adjudging that: (a) the Owner is entitled to all damages, costs and fees it has sustained as a result of Egger's breach of contract; and, (b) Egger is not entitled to a maritime lien against the Vessel;

2.      That, as to Count II, this Court enter judgment against Egger and in favor of the Owner in amounts to be determined by the Court, together with interest, costs and attorneys' fees;

3.      That, in accordance with Fed. R. Civ. P. 65 and Supplemental Admiralty and Maritime Claims Rule E(5)(b), this Court, after hearing, issue a preliminary injunction enjoining Egger, and each of his agents, servants, successors, assigns, employees and attorneys, and all persons acting or purporting to act on his behalf, and all persons having actual notice of any order issued hereunder, from commencing any action or pursuing any claim for maritime lien against the Owner or the Vessel, except in the above-captioned action, and from taking any action in any other jurisdiction to arrest the Vessel and from otherwise interfering with the Owner's use and enjoyment of the Vessel;

4.      That a Short Order of Notice be issued ordering Egger to appear for a hearing on the Owner's application for preliminary injunctive relief and motion for approval of stipulation filed herewith at the Court's earliest convenience;

5.      That Egger be ordered to serve any written opposition(s) together with any supporting affidavit(s), memoranda and exhibits upon counsel for the Owner no later than 48 hours before the scheduled hearing; and

6.      That this Court grant such other and further relief as it deems just and proper.

PLAINTIFF,
JLB LLC,
By it attorney:


            */s/ Robert W. Stetson*
Robert W. Stetson (BBO#669306)
Bernkopf Goodman LLP
2 Seaport Lane, 9th Floor
Boston, Massachusetts 02210
Telephone:     (617) 790-3000
Email:  rstetson@bg-llp.com


Dated:  September 5, 2019

## **<u>VERIFICATION</u>**

I, Randy Goldberg, hereby verify under oath that I am manager of JLB LLC and that I have read the Verified Complaint and the allegations stated in the Verified Complaint are to the best of my belief known by me to be true.

Signed under the pains and penalties of perjury this 5th day of September, 2019.

_/s/ Randy Goldberg_
Randy Goldberg, Manager

860494 v1/4580/1