UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
|  | * |  |
|  | * |  |
|  | * |  |
| JLB LLC, | * |  |
|  | * |  |
| Plaintiff, | * |  |
|  | * | Civil Action No. 1:19-cv-11890-ADB |
| v. | * |  |
|  | * |  |
| CHRISTIAN R. EGGER, | * |  |
|  | * |  |
| Defendant. | * |  |
|  | * |  |

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS**

BURROUGHS, D.J.

Plaintiff JLB LLC (the "Owner") filed this action against Defendant Christian Egger ("Egger"), alleging breach of contract and seeking injunctive and declaratory relief, as well as monetary damages. [ECF No. 1 ("Compl.")]. Currently pending before the Court is Egger's motion to dismiss, which he brings pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), 12(b)(5), and 12(b)(6). [ECF No. 17]. For the following reasons, the motion to dismiss, [ECF No. 17], is <u>DENIED</u>.

I.    **STATEMENT OF FACTS AS ALLEGED**

This summary draws from "the facts [alleged in] the pleadings and whatever supplemental filings (such as affidavits) are contained in the record, giving credence to the plaintiff's version of genuinely contested facts." <u>Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.</u>, 825 F.3d 28, 34 (1st Cir. 2016). The Court may also consider "facts put forward by the defendants, to the extent that they are uncontradicted." <u>Daynard v. Ness</u>, 290 F.3d 42, 51 (1st Cir. 2002).

In 2019, the Owner purchased a custom-built, sixty-eight-foot yacht ("the Vessel"). [ECF No. 20 at 1–2].  In May 2019, while looking for a captain to deliver the Vessel to Massachusetts from Florida, the Owner found a post online in which Egger, a licensed yacht captain, "offer[ed] his services to East Coast yacht owners."  [Compl. ¶ 9; ECF No. 17-2 ("Egger Aff.") ¶ 3].  On May 4, 2019, the Owner called Egger from its principal place of business in Massachusetts.  [Compl. ¶¶ 1, 9, 10].  Egger offered to come to Boston, Massachusetts, for an interview.  [Id. ¶ 10].

Egger drove from Virginia to Boston for the interview on May 12, 2019.  [Id.; Egger Aff. ¶ 4].  During the interview, the Owner reviewed and provided Egger with copies of the Crew Requirements, [ECF No. 1-3], and the Maintenance Schedule, [ECF No. 1-4], and explained that "adherence to the [policies] were essential to the position and that any breach would subject the crew to immediate dismissal."  [Compl. ¶¶ 12–15].  The Owner also reviewed the zero-tolerance drug policy, which provided that Egger was not allowed to drink alcohol while on the Vessel and that he could be terminated immediately for drinking on board.  [Id. ¶ 13; ECF No. 1-3 at 2].  The Owner emphasized that the timely delivery of the Vessel was "important for the Owner's business purposes," as the Owner had scheduled a corporate event on the Vessel in Massachusetts on June 14, 2019.  [Compl. ¶¶ 17, 32].  Once Egger delivered the Vessel to Massachusetts, most of Egger's responsibilities would be performed onshore, with approximately twenty percent of his working time being offshore.  [Id. ¶ 19].

Egger "reiterated that he understood the requirements and . . . assured [the Owner] that he would carry out all of his duties in an exemplary manner."  [Id. ¶ 20].  He asked that the Owner rent an apartment in Falmouth, Massachusetts, for Egger and his family during the summer of

2019, [id. ¶ 21], and said that he was looking forward to spending time in Cape Cod, as he and his wife had family in the area, [id. ¶ 18].

At the end of the interview, the Owner offered Egger the position with a salary of $85,000 per year and agreed to rent an apartment for him in Falmouth. [Id. ¶ 21]. Egger accepted the position, to begin on June 1, 2019, with departure from Florida scheduled for June 5, 2019. [Id. ¶ 23]. The Owner reimbursed Egger $200 for the rental car and other travel expenses related to the interview. [Id. ¶ 5; ECF No. 17 at 1]. The parties did not sign a written contract. [Egger Aff. ¶ 8].

En route from Florida To Massachusetts to deliver the boat, Egger diverted the Vessel to go fishing, used the Owner's fishing gear, and instructed the mate not to tell the Owner about the diversion. [Compl. ¶ 24]. Further, Egger did not perform the Vessel's required daily maintenance, failed to prepare the Vessel for departures, and often drank alcohol and used the Owner's bar. [Id. ¶¶ 26, 28]. Though Egger had told the Owner during the interview that he was not a smoker, during the delivery, Egger smoked "one pack of cigarettes per day, including on the Vessel." [Id. ¶ 27].

On June 7, 2019, the Vessel's electronic tracking system alerted the Owner that "Egger had been operating the Vessel at excessive speeds for excessive periods of time," using more fuel than expected. [Id. ¶ 29]. Further, Egger requested that the Owner raise the credit card limit so that he could purchase additional fuel. [Id.]. The Owner became "concerned about the Vessel's safety and care" and contacted the mate who informed the Owner about the fishing and "expressed concerns about the overall delivery conditions." [Id. ¶ 30].

The next day, on June 8, 2019, Egger told the Owner that he would be turning around and returning to port in Virginia due to sea conditions. [Id. ¶ 31; ECF No. 17 at 2]. Despite the

Owner instructing the crew to stand by for a departure as soon as there was a break in the weather, Egger got drunk and ignored the Owner's calls and texts.  [Compl. ¶¶ 31, 33]. Consequently, Egger "missed an opportunity to resume the trip" in time to meet the Vessel's scheduled delivery date.  [Id. ¶¶ 31–32].  The mate called the Owner and said that "Egger . . . was running the Vessel 'too hard' and . . . had directed [the mate] not to have any communication with the Owner and not to work hard because [Egger and the mate] were being underpaid."  [Id. ¶ 34].

"Several hours later," Egger called the Owner.  [Id. ¶ 35].  Because Egger "slurred his speech" and made "incoherent comments," the Owner thought that he was intoxicated.  [Id.]. The Owner reminded Egger of the "no drinking policy and made clear that drinking at any time while Egger was charged with the care and custody of the Vessel was strictly prohibited."  [Id.]. Egger responded that he would do what he wanted on his "day off," despite the fact that the conversation took place on a work day.  [Id.].  The Owner then fired Egger and "prohibit[ed] him from being on the Vessel," which was still docked in Hampton, Virginia.  [Id. ¶¶ 36, 43].  The Owner also called the Virginia police and asked the local dockmaster to remove Egger from the Vessel.  [Id. ¶ 37].  The dock master "assured the Owner that he would stay on-site" to "protect the Vessel" from Egger "if needed."  [Id. ¶ 39].

On June 10, 2019, Egger contacted the Owner to apologize for his behavior.  [Id. ¶¶ 40– 41].  The Owner "suggested that Egger write a letter of apology" and "reimburse the Owner for the prepaid rental housing costs, costs for fuel for fishing, and other costs incurred."  [Id. ¶ 41]. Though Egger promised to send an apology letter by noon of the following day, the Owner never received it.  [Id. ¶ 42].  Egger contacted the mate to tell him that he had hired a maritime attorney and wanted the mate to speak to the attorney so they could "agree on a strategy for a lawsuit."

[Id.].  Later that day, the Owner flew to Virginia and "witnessed that the Vessel was in a state of disarray."  [Id. ¶ 43].

"As a result of Egger's conduct," the Owner incurred costs exceeding $25,000, including "travel and lodging costs to secure and protect the Vessel in Virginia, rent for the apartment the Owner had rented for Egger's use in Falmouth, a substitute Captain hired by the Owner on short notice, and unauthorized fuel charges and maintenance incurred by Egger during his unauthorized personal use of the Vessel . . . ."  [Id. ¶ 44].

On June 12, 2019, Egger, through his Florida-based attorney, sent the Owner a demand letter in which he sought a total of $2,672.96 in unpaid wages and repatriation charges.[1]  [Id. ¶ 45].  The letter also stated that Egger "require[d]" the Owner's "immediate confirmation" that the unpaid wages and repatriation charges would be paid, in order to "avoid [Egger] filing a Notice of Claim of Lien with the United States Coast Guard against the yacht's Abstract of Title."  [ECF No. 1-2 at 1].  Two days later, on June 14, 2019, the Owner, through its Massachusetts-based attorney, responded to Egger's letter by rejecting the demand for payment and "contended that [the] Owner [was] instead entitled to damages due to Egger's misconduct and numerous breaches of contract."  [Compl. ¶ 46; ECF No. 1-5 at 2].  The Owner offered to escrow 200% of the amount of Egger's demand "to be held as a security for Egger's claim," but Egger rejected this offer, [Compl. ¶ 47], and "continue[d] to threaten seizure of the Vessel upon its return to Florida," [id. ¶ 48].

On September 5, 2019, the Owner filed the instant complaint.  See [Compl.].  The Owner sent the pleadings to Egger's home address by "Federal Express mail, first class mail, and

---

[1] Egger's Florida counsel calculated the unpaid wages and repatriation charges to include $1,862.96 in unpaid wages (for eight days of work); $280 for post-termination hotel expenses; $300 for post-termination airfare; and $230 for baggage charges.  [ECF No. 1-2 at 1].

electronic mail," and retained a process server in Florida for individual service.  [ECF No. 20 at 4].  The process server made three attempts at service on September 6, 9, and 10, 2019, and also called Egger's wife, "who refused to accept service on her husband's behalf and began padlocking the gate in front of her house to prevent access to her front door."  [Id.].  After these failed attempts, the server taped a copy of the pleadings to the outside of the gate.  [Id.].  Egger, who had been captaining a vessel in the Bahamas, discovered the documents taped to his gate when he returned to his home on September 10, 2019.  [Egger Aff. ¶¶ 25, 26].  On November 8, 2019, the Owner hired a Florida constable to serve process upon Egger by Federal Express mail that required a signature, and on November 12, 2019, Egger's wife "accepted and signed for" the package of documents.  [ECF No. 20 at 4–5].

## II.     PROCEDURAL HISTORY

On September 5, 2019, the Owner filed a complaint with the Court, [Compl.], alleging breach of contract, and seeking declaratory judgement, damages, and injunctive relief.  On October 2, 2019, Egger filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), 12(b)(5), and 12(b)(6), alleging (1) that the Court lacks personal jurisdiction over him, [ECF No. 17 at 3–6]; (2) improper venue, [id. at 6–7]; (3) lack of service, [id. at 8–9]; and (4) failure to state a claim, [id. at 9–10].  [ECF No. 17].  The Owner opposed the motion on November 13, 2019.  [ECF No. 20].

## III.    PERSONAL JURISDICTION

Egger first argues that the Court lacks personal jurisdiction over him.  [ECF No. 17 at 3].

### A.     Legal Standard

A plaintiff bears the burden of establishing a court's jurisdiction over a defendant.  Baskin-Robbins, 825 F.3d at 34.  When "a district court rules on a motion to dismiss for lack of

personal jurisdiction without holding an evidentiary hearing," the court applies the prima facie standard. <u>United States v. Swiss Am. Bank, Ltd.</u>, 274 F.3d 610, 618 (1st Cir. 2001). The prima facie standard requires "only that a plaintiff proffer evidence which, taken at face value, suffices to show all facts essential to personal jurisdiction." <u>Baskin-Robbins</u>, 825 F.3d at 34. "For the purposes of examining the merits of such a jurisdictional proffer, [the Court] . . . take[s] the facts from the pleadings and whatever supplemental filings (such as affidavits) are contained in the record, giving credence to the plaintiff's version of genuinely contested facts." <u>Id.</u> (citing <u>Sawtelle v. Farrell</u>, 70 F.3d 1381, 1385 (1st Cir. 1995)). The Court may also "take into account undisputed facts put forth by the defendant." <u>Id.</u> (citing <u>C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.</u>, 771 F.3d 59, 65 (1st Cir. 2014)).

**B.     Discussion**

To exercise personal jurisdiction over a defendant, a court must "find sufficient contacts between the defendant and the forum to satisfy both that state's long-arm statute and the Fourteenth Amendment's Due Process clause." <u>Sawtelle</u>, 70 F.3d at 1387. There are two types of personal jurisdiction that the Court may exercise: general and specific. <u>Pritzker v. Yari</u>, 42 F.3d 53, 59 (1st Cir. 1994). "[G]eneral jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." <u>Id.</u> at 60 (quoting <u>United Elec. Workers v. 163 Pleasant St. Corp.</u>, 960 F.2d 1080, 1088 (1st Cir. 1992)). Specific jurisdiction, on the other hand, "may only be relied upon 'where the cause of action arises directly out of, or related to, the defendant's forum-based contacts.'" <u>Id.</u> (quoting <u>United Elec. Workers</u>, 960 F.2d at 1088–89).

The Owner does not contend that the Court has general jurisdiction over Egger.  See generally [ECF No. 20 at 5–8].  Even if it were to consider the issue, however, the Court lacks general jurisdiction over Egger.  "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile . . . ."  Daimler AG v. Bauman, 571 U.S. 117, 137 (2014) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924 (2011)).  "[A] court may also assert general jurisdiction over an individual when the person offers explicit consent, . . . or is physically present in the forum state."  Grice v. VIM Holdings Group, LLC, 280 F. Supp. 3d 258, 269–70 (D. Mass. 2017) (first citing J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 880 (2011), then citing Burnham v. Superior Court of California, 495 U.S. 604, 703 (1982)).  Because Egger is domiciled in Fort Lauderdale, Florida, has not consented to general jurisdiction, and is not present in Massachusetts, the Court lacks general jurisdiction over him.  See [Egger Aff. ¶1; ECF No. 17 at 5].

Specific jurisdiction requires that the jurisdictional basis for the action "arises from and is limited to [the defendant's] suit-related conduct."  C.W. Downer, 771 F.3d at 65.  To establish specific personal jurisdiction, the Massachusetts long-arm statute must grant such jurisdiction and "the exercise of jurisdiction pursuant to that statute [must] comport[] with the strictures of the Constitution."  Pritzker, 42 F.3d at 60.

### 1.    Massachusetts Long-Arm Statute

Under the Massachusetts long-arm statute, "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth . . . ."  Mass. Gen. Laws ch. 223A, § 3.  "The 'arising from' clause in [the long-arm statute] is . . . generously construed in favor of asserting personal jurisdiction, by applying a 'but for' causation test."  Workgroup Tech.

Corp. v. MGM Grand Hotel, LLC, 246 F. Supp. 2d 102, 112 (D. Mass. 2003).  "[A] claim arises

from a defendant's transaction of business in the forum State if the claim was made possible by,

or lies in the wake of, the transaction of business in the forum State."  Access Now, Inc. v. Otter

Prods., LLC, 280 F. Supp. 3d 287, 291 (D. Mass. 2017) (quoting Tatro v. Manor Care, Inc., 625

N.E.2d 549, 553 (Mass. 1994)).  The arising from inquiry asks "[d]id the defendant's contacts

with the Commonwealth constitute the first step in a train of events that result[ed] in the . . .

injury."  Id. (internal quotation marks omitted) (quoting Lyle Richards Int'l, Ltd. v. Ashworth,

Inc., 132 F.3d 111, 114 (1st Cir. 1997)).  "[T]he defendant's involvement need not be major, as

'just a few acts on [his] part can often suffice to satisfy [subsection (a)]'s threshold for

transacting business.'"  Scuderi Grp., LLC v. LGD Tech., LLC, 575 F. Supp. 2d 312, 319 (D.

Mass. 2008) (quoting Workgroup Tech. Corp., 246 F. Supp. 2d at 110).

Here, the Massachusetts long-arm statute is satisfied because Egger's initial contacts with

Massachusetts, specifically attending the interview and making the agreement with the Owner,

[ECF No. 17 at 1], were the first steps in the "train of events" that resulted in the alleged breach

of contract.  As neither the contract nor the breach would have occurred had Egger not made

those contacts, the "but for" test is satisfied.

### 2.   Due Process

Under the Due Process Clause, a plaintiff must demonstrate that the following three

elements are satisfied for this Court to find that it has personal jurisdiction over a defendant.

C.W. Downer, 771 F.3d at 65.

> First, the claim underlying the litigation must directly arise out of, or relate to, the
> defendant's forum state activities.  Second, the defendant's in-state contacts must
> represent a purposeful availment of the privilege of conducting activities in the
> forum state, thereby invoking the benefits and protections of that state's laws and
> making the defendant's involuntary presence before the state's court foreseeable.
> Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

Pritzker, 42 F.3d at 60–61 (quoting United Elec. Workers, 960 F.2d at 1089).

The inquiry "is 'not susceptible [to] mechanical application,'" PREP Tours, Inc. v. Am. Youth Soccer Org., 913 F.3d 11, 17 (1st Cir. 2019) (quoting Kulko v. Superior Court of Cal., 436 U.S. 84, 92 (1978)), rather, "'[e]ach case requires an individualized weighing of the material facts,'" United Elec. Workers, 960 F.2d at 1088 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 485–86 (1985)). "In constructing such a weighbeam, the measuring points will rarely be written in gleaming black or glistening white. 'The greys are dominant and even among them the shades are innumerable.'" Id. (quoting Estin v. Estin, 334 U.S. 541, 545 (1948)).

i.    Relatedness

A plaintiff must first show "'a demonstrable nexus between [its] claims and [the] defendant's forum-based activities, such . . . [that] the litigation itself is founded directly on those activities.'" C.W. Downer, 771 F.3d at 66 (alteration in original) (quoting Adelson v. Hananel (Adelson I), 652 F.3d 75, 81 (1st Cir. 2011)). The test for relatedness is a "flexible, relaxed standard" that "focuses on the relationship between the defendant and the forum." Adelson I, 652 F.3d at 81 (first quoting N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 25 (1st Cir. 2005), then quoting Hannon v. Beard, 524 F.3d 275, 283 (1st Cir. 2008)).

In a contract dispute, when "examining the defendant's relationship to the forum '[the Court] look[s] to whether the defendant's activity in the forum state was instrumental either in the formation of the contract or its breach.'" Id. (quoting Adams v. Adams, 601 F.3d 1, 6 (1st Cir. 2010)) (internal quotation marks omitted). The Court may consider whether, in the performance of the contract, the defendant was "subject to substantial control and ongoing connection to [Massachusetts]." Id. (alteration in original) (quoting Adams, 601 F.3d at 6).

Though "[a] contract, by itself, cannot automatically establish [the required] contacts," the Court may look to the parties' "prior negotiations and contemplated future consequences, along with . . . the parties' actual course of dealings" to determine whether the defendant had the necessary contacts with the forum state. EIQnetworks, Inc. v. BHI Advanced Internet Solutions, Inc., 726 F. Supp. 2d 26, 34 (D. Mass. 2010) (quoting Swiss Am. Bank, 274 F.3d at 621).

"[N]othing . . . [is] more instrumental in the formation of a contract than the literal act of forming the contract itself." Adelson v. Hananel (Adelson II), 510 F.3d 43, 49 (1st Cir. 2007). A contract may be sufficiently related to the forum (1) when the contract is "formalized and entered into in Massachusetts," and (2) when performance of the contract is "subject[] . . . to substantial control and ongoing connection to Massachusetts . . . ." Id. at 49–50.  Additionally, communication with a party in Massachusetts throughout the performance of the contract is a significant factor indicating relatedness. Crowe v. Harvey Klinger, Inc., 277 F. Supp. 3d 182, 191 (D. Mass. 2017) (citing C.W. Downer, 771 F.3d at 66).

The "prior negotiations and contemplated future consequences" related to the contract at issue here suggest that Egger's contacts with Massachusetts were "instrumental" in the formation of the contract.  Egger's interview, during which he and the Owner established the major terms and requirements of the position, took place in Boston.  [Compl. ¶¶ 11–14].  Though some of the terms, such as the crew requirements and maintenance schedule, were not negotiated terms, the parties did discuss the Owner providing an apartment for Egger and his family in Falmouth.  [Id. ¶ 21].  In addition, Egger accepted the position during the Boston interview, [id. ¶¶ 21–22], and remained in frequent contact with the Owner in Massachusetts throughout the "actual course of dealing," Daynard, 290 F.3d at 52 (quoting Burger King, 471 U.S. at 479), such as reporting any time that the Vessel left port, as required by the contract, see [ECF No. 1-3 at 1].  Even if

Egger's alleged breaches of the contract did not occur in Massachusetts, his extensive contacts with the state in both the formation and the performance of the contract are sufficient to fulfill the relatedness prong.  See, e.g., EIQnetworks, 726 F. Supp. 2d at 34 (finding that the defendant's "contacts with [the plaintiff] in Massachusetts via telephone, e-mail and fax to negotiate the terms of the software agreement . . . fulfill[ed] the relatedness inquiry"); [ECF No. 17 at 1].

        ii.        Purposeful Availment

For the second prong, the Owner must "show that [Egger] purposefully availed [himself] of 'the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable.'"  Phillips v. Prairie Eye Center, 530 F.3d 22, 28 (1st Cir. 2008) (quoting Daynard, 290 F.3d at 61).  The inquiry focuses "on the defendant's intentions, and the cornerstones are voluntariness and foreseeability."  Bluetarp Financial, Inc. v. Matrix Const. Co., Inc., 709 F.3d 72, 82 (1st Cir. 2013) (first citing Carreras v. PMG Collins, Inc., 660 F.3d 549, 555 (1st Cir. 2011), then citing Hannon, 524 F.3d at 284).

"Voluntariness requires that the defendant's contacts with the forum state 'proximately result from actions by the defendant [himself].'"  Phillips, 530 F.3d at 28 (quoting Burger King Corp., 471 U.S. at 475).  Those contacts "must be deliberate, and 'not based on the unilateral actions of another party.'"  Id. (quoting Adelson II, 510 F.3d at 50).  "[T]he defendant's contacts [with the forum state] must be such that [the defendant] could 'reasonably anticipate being haled into court there.'"  Adelson II, 510 F.3d at 50 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

Here, both requirements are met.  Egger's contacts with Massachusetts were clearly voluntary.  Shortly after initiating contact with Egger, the Owner explained that the position would include transporting the Vessel from Florida to Massachusetts and assuming the "care and custody of the Vessel" after it had docked in Massachusetts.  [Compl. ¶¶ 9, 11; Egger Aff. ¶¶ 3, 9–10].  Egger accepted the connection to Massachusetts as evidenced by the fact that he undertook to complete the interview and hiring process with the Owner, [Compl. ¶¶ 11–22], including offering to drive from Virginia to Boston for the interview [Compl. ¶¶ 10–11; Egger Aff. ¶ 4].  Egger also requested that the Owner rent an apartment in Massachusetts so that his family could live there during the summer months, thereby demonstrating that he understood that the position would include substantial time in Massachusetts.  [Compl. ¶ 21].  Egger's actions, taken together, demonstrate that his contacts with Massachusetts were voluntary.

Egger's forum-related contacts also satisfy the foreseeability requirement.  By negotiating a contract in Massachusetts that was primarily to be performed in Massachusetts, he "should have recognized that by entering into contractual negotiations and an agreement for services" in Massachusetts, he "could be compelled to appear in a Massachusetts forum." Conning v. Halpern, No. 18-cv-12336, 2019 WL 2514730, at *7 (D. Mass. June 18, 2019). Egger was present in Massachusetts when he orally accepted the position.  [Compl. ¶¶ 10, 21–22; Egger Aff. ¶¶ 4, 7].  At that time, he was told that the position would begin on June 1, 2019, and that the Vessel had to be delivered in Massachusetts on June 14, 2019, meaning that he was aware from the very outset that, other than the fourteen days transporting the Vessel, his work would be based primarily in Massachusetts.  [Compl. ¶¶ 11, 23, 32].

iii.      Reasonableness

The final step of the Due Process inquiry is determining the reasonableness of exercising

jurisdiction over a defendant.[2]  C.W. Downer, 771 F.3d at 65.  The First Circuit has identified

the following "Gestalt factors" to guide the reasonableness inquiry:

> (1) the defendant's burden of appearing, (2) the forum state's interest in
> adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and
> effective relief, (4) the judicial system's interest in obtaining the most effective
> resolution of the controversy, and (5) the common interests of all sovereigns in
> promoting substantive social policies.

Pritzker, 42 F.3d at 63–64 (quoting United Elec. Workers, 960 F.2d at 1088).

First, the burden on Egger of appearing will not be unduly burdensome.  Defending an

action in a foreign jurisdiction "is almost always inconvenient and/or costly, . . . [and] this factor

is only meaningful where a party can demonstrate some kind of special or unusual burden."  Id.

at 63.  Because Egger does not allege anything "special or unusual" about his situation, this

factor does nothing to undermine the reasonableness of exercising personal jurisdiction.

The second factor, Massachusetts' interest in hearing the suit, similarly weighs in favor

of exercising jurisdiction.  "[A] State generally has a 'manifest interest' in providing its

resident[s] with a convenient forum for redressing injuries inflicted by out-of-state actors."

Baskin-Robbins, 825 F.3d at 40 (second alteration in original) (quoting Burger King, 471 U.S. at

473).  Specifically, "Massachusetts has a significant interest in ensuring that contracts entered

into by Massachusetts residents are given full effect."  Champion Exposition Servs., Inc. v. Hi-

Tech Elec., LLC, 273 F. Supp. 2d 172, 178 (D. Mass. 2003).

The third Gestalt factor, the Owner's interest in obtaining convenient and effective relief,

also weighs in favor of exercising jurisdiction.  "The First Circuit has repeatedly observed that 'a

---

[2] Egger does not address the reasonableness prong.  See generally [ECF No. 17].

plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience.'" Wolverine Proctor & Schwartz, Inc. v. Aeroglide Corp., 394 F. Supp. 2d 299, 311 (D. Mass. 2005) (quoting Sawtelle, 70 F.3d at 1395).  Seeing as the Owner is located in Massachusetts and has chosen to litigate in Massachusetts, the third factor favors jurisdiction. See generally [Compl.].

The fourth factor, the judicial system's interest in obtaining the most effective resolution of the controversy, considers whether the Court's intervention would provide efficient or effective relief.  Nowak, 94 F.3d at 718.  This factor is "[u]sually . . . a wash," id. (citing Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 211 (1st Cir. 1994), and as Egger has not offered any argument suggesting that litigating in Massachusetts would not provide efficient or effective relief, see generally [ECF No. 17], this factor either weighs in favor of the Owner or is neutral.

"The [fifth] gestalt factor requires this Court to consider the interests of the affected forum states in substantive social policies." Sigros v. Walt Disney World Co., 129 F. Supp. 2d 56, 69 (D. Mass. 2001) (citing Nowak, 94 F.3d at 719).  Here, Massachusetts has a strong interest in providing a forum for resolving this dispute and, further, there is no "clearly superior forum that will better promote the substantive social policies of the sovereigns involved." Conning, 2019 WL 2514730, at *7.  The Court finds that the Gestalt factors strongly weigh in favor of the Owner, such that it is reasonable to exercise personal jurisdiction over Egger.

## IV.    VENUE

Egger argues next that the Owner's complaint should be dismissed because venue is improper in the District of Massachusetts.  [ECF No. 17 at 6].

### A.      Legal Standard

"Once a defendant has raised the issue of venue through a motion to dismiss, the burden

falls on the plaintiff to demonstrate that venue is proper." Barrigas v. United States, No. 17-cv-

10232, 2018 WL 1244780, at *6 (D. Mass. Mar. 9, 2018) (quoting Berklee Coll. of Music, Inc.

v. Music Indus. Educators, Inc., 733 F. Supp. 2d 204, 211 n.49 (D. Mass. 2010)).

Under 28 U.S.C. § 1391, venue is proper in:

(1) a judicial district in which any defendant resides, if all defendants are residents
of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving
rise to the claim occurred, or a substantial part of property that is the subject of the
action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided
in this section, any judicial district in which any defendant is subject to the court's
personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).  The Court is "not required to determine the *best* venue . . . ." Astro-Med,

Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 12 (1st Cir. 2009) (emphasis added) (citing Uffner

v. La Reunion Francaise, S.A., 244 F.3d 38, 42 (1st Cir. 2001)).

Egger argues that the venue is improper in Massachusetts because (1) he is not a resident

of Massachusetts, (2) "none of the significant events or omissions giving rise to [the Owner's]

claim occurred in Massachusetts" and (3) the action could have been brought in Florida.  [ECF

No. 17 at 7].

When evaluating whether an action properly falls under § 1391(b)(2) [3], the Court "takes a

'holistic view'" of acts giving rise to the claim, Van Eperen v. Mass. Mut. Life Ins., Co., No. 14-

---

[3] The Court notes that venue would not be proper in Massachusetts under § 1391(b)(1) because
Egger resides in Florida. [Egger Aff. ¶ 1].  Because venue could also be proper in Florida where
Egger resides, § 1391(b)(3), which applies only when "there is no district in which an action may
otherwise be brought as provided in this section" is inapplicable.  28 U.S.C. § 1391(b).

cv-13008, 2017 WL 9249439, at *12 (D. Mass. Feb. 28, 2017) (quoting <u>Astro-Med</u>, 591 F.3d at

12), and looks "not to a single triggering event prompting the action, but to the entire sequence

of events underlying the claim," <u>Uffner</u>, 244 F.3d at 42 (internal quotation marks and citation

omitted); <u>see also</u> <u>id.</u> at 42 n.6 ("In considering 'events or omissions' for purposes of venue, [the

First Circuit] decline[s] to adopt the . . . approach [that] . . . looks only at the acts of the

defendant."); <u>Pesmel N. Am., LLC v. Caraustar Indus., Inc.</u>, 754 F. Supp. 2d 168, 175 (D. Mass.

2010) (finding that "[t]he fact that substantial activities took place in other districts does not

preclude a finding that venue is proper in Massachusetts.").  Determining whether venue is

proper in a contract case "turns on many of the same factors relevant to personal jurisdiction."

<u>Get In Shape Franchise, Inc. v. TFL Fishers, LLC</u>, 167 F. Supp. 3d 173, 196 (D. Mass 2016)

(quoting <u>Pesmel</u>, 754 F. Supp. 2d at 175).

## B.       Discussion

In asserting that "none of the significant events or omissions giving rise to the claim

occurred in Massachusetts," Egger focuses only on the circumstances surrounding the alleged

breach itself.  [ECF No. 17 at 5–7 ("All of the alleged events that led to [the Owner]'s

termination of [Egger] occurred while the [V]essel was docked in, or sailing off the coast of,

Florida, North Carolina, and Virginia.")].  When evaluating venue in a contract action, however,

the Court looks not only to where the breach occurred, but also to things such as "where the

contract was negotiated or executed" and "where it was to be performed . . . ."  <u>Get In Shape</u>,

167 F. Supp. 3d at 196 (quoting <u>Pesmel</u>, 754 F. Supp. 2d at 175); <u>see e.g.</u>, <u>Blu Homes, Inc. v.

Kaufmann</u>, No. 10-cv-11418, 2011 WL 3290362, at *8 (D. Mass. July 29, 2011) (finding that

although out of state breach was the "triggering event" prompting the action, the previous

sequence of events surrounding the contract rendered venue proper in Massachusetts).  Egger

argues that the contract was not formed until he began performance in Florida.  [ECF No. 17 at 6, 10].  Even assuming, *arguendo*, that Egger is correct and that his acceptance occurred in Florida rather than at the interview, the negotiations and discussion of terms in Boston are still "significant," as they set in motion the "sequence of events" that led to the alleged breach. Avidyne Corporation v. Lewis, No. 16-cv-10179, 2016 WL 9402846, at *4 (D. Mass. Nov. 17, 2016) (quoting Astro-Med, 591 F.3d at 12) (finding that even without evidence showing the contract was entered into in Massachusetts, venue was proper because the plaintiff provided evidence showing that the California defendant was "doing business" in Massachusetts); [ECF No. 17 at 6].

Finally, Egger argues that the case should have been brought in Florida.  [ECF No. 17 at 7, 9].  Though Florida may also be a proper venue, [id.], that does not mean that it was improper for the Owner to file this action in Massachusetts, Shelton Bros., Inc. v. Aleph Wines Corp., No. 13-cv-30180, 2014 WL 4656635 (D. Mass. July 21, 2014) (noting that "even though South Carolina could be a proper venue for [the] dispute, Massachusetts [was] where the events occurred as well" and could therefore be a proper venue), report and recommendation adopted, No. 13-cv-30180, 2014 WL 4657109 (D. Mass. Sept. 10, 2014).  Here, the events in Massachusetts that led to the underlying claim, including the interview, the contract negotiations, the job offer, and the regular communications between Egger and the Owner, render venue proper in Massachusetts.

V.     SERVICE OF PROCESS

Egger next argues that this action should be dismissed because the service of process was inadequate.  [ECF No. 17 at 8].

### A.      Legal Standard

"'Before a federal court may exercise personal jurisdiction over a defendant, the

procedural requirements of service of process must be satisfied.'" Cichocki v. Mass. Bay Cmty.

Coll., 174 F. Supp. 3d 572, 575 (D. Mass. 2016) (quoting Aly v. Mohegan Council-Boy Scouts

of Am., No. 08-cv-40099, 2009 WL 3299951, at *1 (D. Mass. Apr. 20, 2009)).  "Where . . . 'the

sufficiency of process is challenged under Rule 12(b)(5), . . . the plaintiff bears the burden of

proving proper service.'"  Id. (quoting Aly, 2009 WL 3299951, at *2); see also Connolly, 355 F.

Supp. 3d at 14 ("Once adequately challenged, the burden shifts to plaintiff to show service was

proper." (citing Rivera-Lopez v. Municipality of Dorado, 979 F.2d 885, 887 (1st Cir. 1992))).[4]

### B.      Discussion

Rule 4 of the Federal Rules of Civil Procedure states that

> [u]nless federal law provides otherwise, an individual . . . may be served in a
> judicial district of the United States by: (1) following state law for serving a
> summons in an action brought in courts of general jurisdiction in the state where
> the district court is located or where service is made . . . .

Fed. R. Civ. P. 4(e).  Therefore, the Owner could have served process on Egger in accordance

with either Florida law, where service was made, see [ECF No. 20 at 4], or Massachusetts law,

where the action was filed, see generally [Compl.].  The Owner relies on Massachusetts law to

establish that service was proper.  [ECF No. 20 at 9–10].  Although Egger argues that service

---

[4] Although Egger ostensibly brings the motion under Rule 12(b)(4) of the Federal Rules of Civil
Procedure, [ECF No. 17 at 8], "[a] motion to dismiss for improper process under Fed. R. Civ. P.
12(b)(4) pertains to the 'content of the summons' and a motion to dismiss for improper service of
process under Fed. R. Civ. P. 12(b)(5) challenges the 'mode of delivery.'"  Connolly v. Shaw's
Supermarkets, Inc., 355 F. Supp. 3d 9, 14 (D. Mass. 2018) (quoting Taite v. Bridgewater State
Univ., 236 F. Supp. 3d 466, 472 (D. Mass. 2017).  As Egger challenges the mode of delivery of
the summons rather than the contents, the Court considers the motion under Rule 12(b)(5).

was improper under Florida law, he also seemingly concedes that service could have also been made in accordance with Massachusetts law.  See generally [ECF No. 17 at 8–9].[5]

Egger asserts that the summons and complaint originally mailed to him were insufficient because they did not require a signed receipt and that the Owner's subsequent attempt at service, which included the process server taping the summons and complaint to the front gate of Egger's home, was also insufficient.[6]  [Id.].

1.    Service Under Massachusetts Law

Under the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, "when the law of the Commonwealth authorizes service outside the Commonwealth, the service, when reasonably calculated to give actual notice, may be made, among other means, 'by personal delivery in the manner prescribed for service within this commonwealth.'"  Christian Book Distributors, Inc. v. Wallace, 760 N.E.2d 735, 737 (Mass. App. Ct. 2001) (quoting Mass. Gen. Laws ch. 223A, § 6(a)(1)).  Section 4 of the long-arm statute provides that "[w]hen the exercise of personal jurisdiction is authorized by this chapter, service may be made outside this commonwealth."  Mass. Gen. Laws ch. 223A, § 4.  Here, because personal jurisdiction over Egger is authorized by the long-arm statute, the law of the Commonwealth authorizes service outside of Massachusetts, consistent with § 6.  See id.

Rule 4(e) of the Massachusetts Rules of Civil Procedure governs the requirements for proper service of process outside of the Commonwealth.  Crossetti v. Cargill, Inc., No. 18-cv-

---

[5] As discussed below, the Court finds that service was proper under Massachusetts law, and therefore does not reach the issue of whether service was also proper under Florida law.

[6] Although Egger claims that taping the summons and complaint to the gate was improper under Massachusetts law, he does not explain his reasoning for this argument.  See generally [ECF No. 17 at 8–9].

30002, 2018 WL 2770130, at *2 (D. Mass. June 8, 2018) ("Subdivision (e) of Rule 4 controls

out-of-state service."). That section provides:

> [w]hen any statute or law of the Commonwealth authorizes service of process outside the Commonwealth, the service shall be made by delivering a copy of the summons and of the complaint: (1) in any appropriate manner prescribed in subdivision (d) of this Rule; or (2) in the manner prescribed by the law of the place in which the service is made for service in that place in an action in any of its courts of general jurisdiction; or (3) by any form of mail addressed to the person to be served and requiring a signed receipt; or (4) as directed by the appropriate foreign authority in response to a letter rogatory; or (5) as directed by order of the court.

Mass. R. Civ. P. 4(e). Rule 4(e)(1), in conjunction with §§ 4 and 6 of the long-arm statute,

authorized the Owner to serve process on Egger in any of the manners allowed by Mass. R. Civ.

P. 4(d). See Mass. R. Civ. P. 4(e); Mass. Gen. Laws ch. 223A, §§ 4, 6.

> Rule 4(d) of the Massachusetts Rules of Civil Procedure . . . provides that 'personal service' upon an individual within the Commonwealth may be made by delivering a copy of the summons and of the complaint to him personally; or by leaving copies thereof at his *last and usual place of abode*. The purpose of this provision is to permit service of process upon a nonresident defendant by leaving such process at his home.

Christian Book Distributors, 760 N.E.2d at 737 (internal quotation marks omitted) (quoting

Mass. R. Civ. P. 4(d)(1)).

Here, the Owner alleges that he made several attempts at service using multiple methods.

[ECF No. 20 at 4–5]. The Owner first sent the documents to Egger at his home address via

Federal Express mail, first class mail, and electronic mail. [Id.]. The Owner then hired a process

server in Florida who, after multiple unsuccessful attempts to hand deliver the documents to

Egger's wife, left the documents at Egger's home address. [Id. at 4].

On November 8, 2019, shortly after Egger filed a motion claiming improper service,

[ECF No. 17], the Owner served him again, this time by Federal Express mail that required a

signature acceptance. [ECF No. 21]. On November 12, 2019, Egger's wife signed a receipt

upon delivery of the package.[7]  [Id.].  As Egger has conceded, Massachusetts law permits out-of-state service by "signed-receipt mail," [ECF No. 17 at 8 (citing Mass. R. Civ. P. 4(e))], and thus the Owner's service in November, which required signature upon receipt, was proper under Massachusetts law.[8]

The Court finds that the Owner sufficiently served process upon Egger in accordance with Massachusetts and federal law because (1) the summons and complaint were left at Egger's "last and usual place of abode," see Mass. R. Civ. P. 4(e), 4(d), and (2) the summons and complaint were served by mail requiring a signed receipt, see Mass. R. Civ. P. 4(e).

## VI.    FAILURE TO STATE A CLAIM

Lastly, Egger argues that the Owner has failed to state a claim upon which relief can be granted because his breach of contract claim is barred by the statute of frauds, Mass. Gen. Laws ch. 259, § 1.  [ECF No. 17 at 9–10].

### A.    Legal Standard

When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must "accept as true all well-pleaded facts, analyz[e] those facts in the light most hospitable to the plaintiff's theory, and draw all reasonable inferences" from those facts in favor of the plaintiff.  U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011).  To avoid dismissal, a complaint must "set forth 'factual

---

[7] The Owner stated that "upon receipt of the signature, the Owner intends to file a new affidavit of service containing evidence of the signature," [ECF No. 20 at 5], and subsequently filed that affidavit, [ECF No. 21].

[8] Under the Massachusetts Rules of Civil Procedure, a plaintiff has 90 days to serve process upon the defendant.  Mass. R. Civ. P. 4(j).  The November 8, 2019 mailing falls within 90 days of September 5, 2019, the date upon which the Owner filed the complaint.  See generally [Compl.; ECF No. 20 at 4–5].  Egger has not filed a reply suggesting the November service was improper.

allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (citation omitted).  A plaintiff's obligation to articulate the basis of her claims "requires more than labels and conclusions."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). The facts alleged, when taken together, must be sufficient to "state a claim to relief that is plausible on its face." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).

### B.      Discussion

"Under Massachusetts law, a breach of contract claim requires the plaintiff to show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." Bose Corp. v. Ejaz, 732 F. 3d 17, 21 (1st Cir. 2013) (citing Singarella v. City of Boston, 173 N.E.2d 290, 291 (Mass. 1961)).  Egger's motion to dismiss challenges only the first element: the existence of a valid contract.  See [ECF No. 17].

Egger offers a single argument in support of his claim that there was no enforceable contract between the parties, namely that, in order to be a valid contract under the statute of frauds, his agreement with the Owner required a signed writing.  [Id. at 9–10].  It is uncontested that there was no writing signed by the parties.  See [id.; ECF No. 20 at 10].

A plaintiff bears the burden of proving that there was an "agreement between the parties on the material terms of that contract, and [that] the parties . . . ha[d] a present intention to be bound by that agreement."  Situation Mgmt. Sys., Inc. v. Malouf, Inc., 724 N.E.2d 699, 703

(Mass. 2000); see also Moore v. LA-Z-Boy, Inc., 639 F. Supp. 2d 136, 140 (D. Mass. 2009)

(explaining that plaintiffs bear the burden of proof as to the existence of a contract (citing

Canney v. New England Tel. & Tel. Co., 228 N.E.2d 723, 727 (Mass. 1967))).  "All the essential

terms of a contract must be [sufficiently] definite and certain so that the intention of the parties

may be discovered, the nature and extent of their obligations ascertained, and their rights

determined."  Moore, 639 F. Supp. 2d at 140 (alteration in original) (quoting Cygan v.

Megathlin, 96 N.E.2d 702, 703 (Mass. 1951)).  Generally, binding contracts may be either

written or oral.  Beauregard v. Meldon, No. 19-cv-10342, 2019 WL 6877185, at *3 (D. Mass.

Dec. 17, 2019).  In certain circumstances, however, a writing signed by the parties is required in

order for the contract to be enforceable.  See Mass. Gen. Laws ch. 259, § 1.

Under the statute of frauds, Mass. Gen. Laws ch. 259, § 1, "any service contract that

cannot be fully performed within one year of its making must be reduced to writing to be

enforceable."  Global Health 2000, Inc. v. Pfizer Inc., 533 F. Supp. 2d 222, 224 (D. Mass. 2008).

The statute provides, in part:

> No action shall be brought . . . , [u]pon an agreement that is not to be performed
> within one year from the making thereof; [u]nless the promise, contract or
> agreement upon which such action is brought, or some memorandum or note
> thereof, is in writing and signed by the party to be charged therewith or by some
> person thereunto by him lawfully authorized.

Mass. Gen. Laws ch. 259, § 1.

"The Statute of Frauds 'applies only to contracts which by their terms cannot be

performed within the year.  It does not apply to contracts which may be performed within,

although they may also extend beyond, that period.'"  Boothby v. Texon, 608 N.E.2d 1028, 1035

(Mass. 1993) (quoting Doherty v. Doherty Ins. Agency, Inc., 878 F.2d 546, 551 (1st Cir. 1989)).

In the context of employment, "contracts that can be discharged within a year do not fall within

the statute of frauds."  Coyle v. Kittredge Ins. Agency, Inc., No. 12-cv-40014, 2014 WL

1330859, at *2 (D. Mass. Mar. 28, 2014) (citing Meng v. Trustees of Boston University, 693

N.E.2d 183, 185–86 (Mass. App. Ct. 1998)).

Egger argues that his agreement with the Owner falls under the statute of frauds and thus

can only be enforceable if it was in writing and signed by the parties.  [ECF No. 17 at 10].  At

the time that he and the Owner made the oral agreement, Egger claims that his understanding of

the position of Captain of the Vessel required him "to carry out voyages over an indefinite,

extended period of time," which he believed would "greatly surpass the one-year threshold."

[ECF No. 17 at 10].  Courts in Massachusetts, however, "have interpreted [the language of § 1]

to mean that a contract must be in writing *only if the terms of the contract make it clear that the*

*contract cannot* be performed within a year."  Coyle, 2014 WL 1330859, at *2 (citing Doherty,

878 F.2d at 551–52).  Cf. Lahlou v. Daley, 874 F. Supp. 2d 8, 11 (D. Mass. 2012) (finding that

the parties' understanding that Plaintiff was to be employed for at least a year-and-a-half brought

the contract under the statute); Powers v. Boston Cooper Corp., 926 F.2d 109, 110–11 (1st Cir.

1991) (holding that a contract that was to last until the thirty-two-year-old plaintiff turned

seventy was impossible to perform within one year and was thus unenforceable).  Egger, citing

only his "understanding" of the position's timeframe based on the conversation at his interview,

has failed to allege any mutually understood, material terms of the contract that would "make it

clear" that it would be impossible to perform the contract within one year.  Coyle, 2014 WL

1330859, at *2.  See generally [ECF No. 17].

The Owner argues that the agreement is enforceable under the statute of frauds because it

was for an indefinite time period and thus could have been performed within one year.  [ECF No.

20 at 10–11].  The Court agrees with the Owner.  Here, although the agreement could have

continued past the one-year threshold, the writing requirement does not apply because it also could have been performed within one year.  See Boothby, 608 N.E.2d at 1035–36 (noting that the statute of frauds did not invalidate oral contract for permanent employment).  During Egger's interview in Boston, the Owner explained that Egger's job would be "to deliver [the Vessel] from Florida to Massachusetts, and more generally, to oversee, operate and maintain the Vessel while in [Egger's] care."  [Compl. ¶ 11].  The interview took place on May 12, 2019, [id. ¶ 11], and the Vessel was schedule to arrive in Massachusetts on June 14, 2019, [id. ¶ 32].  The parties also agreed that the Owner would rent an apartment for Egger and his family for that summer. [Id. ¶ 21].  Performance of those explicit terms would have been complete by the end of that first summer.  Although it was possible that Egger could have held the position for more than a year, it was also fully possible for the terms to be performed in less than one year.  For this reason, the Court finds that the contract between Egger and the Owner does not fall under the statute of frauds and therefore plaintiff's breach of contract claim is not barred on that basis.[9]

## VII.    CONCLUSION

For the reasons set forth herein, the Court finds that it has personal jurisdiction over Egger, venue is proper in this district, service of process upon Egger was proper, and the Owner has stated a claim upon which relief could be granted.  Accordingly, Egger's motion to dismiss, [ECF No. 17], is DENIED.

**SO ORDERED.**

May 28, 2020                                         /s/ Allison D. Burroughs
                                                    ALLISON D. BURROUGHS
                                                    U.S. DISTRICT JUDGE

---

[9] The Owner argues in the alternative that the claim would not be barred because promissory estoppel may be an exception to the statute.  [ECF No. 20 at 11].  Because the contract does not fall within the statute of frauds, considering whether that exception applies here is unnecessary.